UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TRISTON CAMPBELL,

                           Counter Claimant,
                                                      3:19-CV-1221
v.                                                          (GLS/ML)

JEREMY L. TUTORA,

                           Counter Defendant.
_____

APPEARANCES:

SMITH, SOVIK, KENDRICK & SUGNET, P.C.                 STEVEN WILLIAMS, ESQ.
  Counsel for Counter Claimant
250 South Clinton Street, Suite 600
Syracuse, New York 13202-1252

JEREMY L. TUTORA
  *Pro Se* Counter Defendant
163 Schubert Street, Apt. 1L
Binghamton, New York 13905

MIROSLAV LOVRIC, United States Magistrate Judge

## **REPORT-RECOMMENDATION**

      Currently before the Court in this civil rights action filed by plaintiff Jeremy L. Tutora ("Counter Defendant") against defendant Triston Campbell ("Counter Claimant") is a referral from United States Senior District Judge Gary L. Sharpe to the undersigned for a report and recommendation regarding damages on Counter Claimant's default judgment against Counter Defendant. (Dkt. No. 93.)

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

    A.      **Counter Defendant's Complaint**

On October 1, 2019, Counter Defendant initiated this action against Counter Claimant, a Town of Manlius Police Officer. (Dkt. No. 1.) Counter Defendant asserted claims of excessive force and unlawful search and seizure in violation of the Fourth Amendment and 42 U.S.C. § 1983, seeking damages in the amount of $1,000,000.00. (*Id.* at 4-5.) Counter Defendant alleged that during a traffic stop on August 8, 2019, Counter Claimant, *inter alia*, "became enraged, opened [Counter Defendant's] car door, and pulled [Counter Defendant] out" before "throwing [Counter Defendant] on the back of [his] car."[1] (*Id.* at 3.) Counter Defendant alleged that Counter Claimant then "began to grab [Counter Defendant's] privates as [he] screamed for [Counter Claimant] to stop[.]" (*Id.*) Counter Defendant stated that he was "aggressively" searched and that his arm was "twist[ed] and ben[t]" as Counter Claimant handcuffed him, resulting in a "sprained right wrist." (*Id.*) Additionally, Counter Defendant asserted that Counter Claimant "threw [Counter Defendant] in the back of [the] patrol car" and proceeded to search Counter Defendant's vehicle. (*Id.*) Counter Defendant alleged that Counter Claimant sat him "in [the] patrol car for an hour just wasting time on the clock" before letting him go.[2] (*Id.*)

    B.      **Counter Claimant's Amended Answer with Counterclaims**

On September 21, 2020, Counter Claimant interposed an amended answer asserting four state law defamation counterclaims against Counter Defendant. (Dkt. No. 44.)

---

[1]    Counter Defendant was stopped for using a cell phone while driving. (Dkt. No. 98 at 1-2.)

[2]    As a result of the traffic stop, Counter Defendant received citations for Operating a Motor Vehicle While Using a Portable Electronic Device (N.Y. V.T.L. § 1225-D) and Unlawful Possession of Marijuana (N.Y. Pen. L. § 221.05). (Dkt. No. 98, Attach. 1 at 9-11.)

As to the first count, Counter Claimant alleged that "[o]n or about August 9, 2019, [Counter Defendant] . . . called the Town of Manlius Police Department and left a voice message with Sergeant Gregory Snyder" wherein Counter Defendant "falsely stated" that Counter Claimant "pulled" Counter Defendant out of his car, "'vulgarly' searched him by 'grabbing his private parts,'" and "searched his vehicle and his person without cause." (*Id.* at ¶¶ 18-20.)

With respect to the second count, Counter Claimant alleged that "[o]n or about August 20, 2019, [Counter Defendant] . . . went to the Town of Manlius Police Department to file a false and unfounded complaint against" Counter Claimant, in which, Counter Defendant "falsely stated to Captain Slater that he was 'stopped for no reason' in his vehicle," and that Counter Claimant "targeted" Counter Defendant and "made up a reason to stop [him]." (*Id.* at ¶¶ 25-26.) Furthermore, Counter Defendant allegedly stated to Captain Slater that he "was manhandled by" Counter Claimant and "injured" as a result. (*Id.* at ¶ 27.)

As to the third count, Counter Claimant alleged that "[i]n a letter to the Village of Fayetteville Justice Court dated September 1, 2019, [Counter Defendant] falsely stated he was pulled over by [Counter Claimant] for 'DWB (Driving While Black)'" and that "[t]hey are racist in this area."[3] (Dkt. No. 44 at ¶ 32.) Counter Claimant alleged that in the same letter, Counter Defendant falsely stated that Counter Claimant harassed him, used excessive force against him, accused him of lying because of his ethnicity, pulled him out of the car, aggressively handcuffed him, "manhandled" him, and "grabbed his private parts as he screamed for [Counter Claimant] to stop." (*Id.* at ¶¶ 33-38 [internal quotation marks omitted].)

---

[3]    Relative to this allegation, Counter Claimant points out that he is also Black. (Dkt. No. 44 at ¶ 32.)

Finally, Counter Claimant alleged in his fourth claim that the allegations contained in Counter Defendant's Complaint are likewise false and thus defamatory.[4]  (Dkt. No. 44 at ¶¶ 43-60.)  Counter Claimant asserted that the underlying matter "is a 'sham' lawsuit brought solely to defame [Counter Claimant]."  (*Id.* at ¶ 57.)  Counter Claimant sought compensatory damages of $1,000,000.00, punitive damages in an amount to be determined, and the costs and disbursements of this action.  (*Id.* at 9).

### C.   Complaint Dismissal and Default Judgment

On November 30, 2020, Counter Claimant filed a motion pursuant to Fed. R. Civ. P. 37(b)(2) and 41(b), seeking to dismiss Counter Defendant's Complaint for "failure to comply with numerous Court Orders, refusal to engage in discovery, and failure to prosecute the action." (Dkt. No. 51, Attach. 2 at 3.)  The Court granted the motion on June 8, 2021, and on June 24, 2021, the Court directed Counter Defendant to—within thirty days—answer Counter Claimant's counterclaims.  (Dkt. Nos. 70, 73.)  Counter Defendant failed to do so.  (*See generally* docket sheet.)  As a result, on November 24, 2021, Counter Claimant moved for default judgment. (Dkt. No. 91.)  On August 18, 2022, the Court awarded default judgment as to liability and referred the matter to the undersigned "for the sole purpose of conducting an Inquest Hearing on damages and issuing a Report and Recommendation."  (Dkt. Nos. 92, 93.)

### D.   Evidentiary Hearing

On November 10, 2022, the undersigned presided over an inquest hearing to determine what damages, if any, Counter Claimant is entitled to recover.  (Minute Entry dated 11/10/2022.) Counter Claimant appeared with counsel at the hearing as the sole witness in support of his

---

[4]  During the November 10, 2022, hearing, Counter Claimant's counsel acknowledged that Counter Defendant's statements relative to this count are entitled to "litigation privilege." (Dkt. No. 105 at 5-6.)

request for damages.[5]  (Minute Entry dated 11/10/2022.)  Counter Claimant introduced five documentary exhibits, and a DVD copy of body worn camera footage depicting the August 8, 2019, traffic stop.[6]  Despite several written notices mailed by the Clerk of the Court to Counter Defendant's last updated address, Counter Defendant did not appear at the hearing or in any way oppose Counter Claimant's request for damages.  (Dkt. Nos. 94, 96, 97, 103, 104; Dkt. No. 105 at 2.)

During the hearing, Counter Claimant provided testimony regarding the underlying events of August 8, 2019, Counter Defendant's statements regarding the incident, and the impact of those statements on Counter Claimant.  (Dkt. No. 105 at 8-51.)  Counsel for Counter Claimant also presented arguments in support of awarding damages and reduced Counter Claimant's demand for relief from $1,000,000.00, in total, to $10,000.00 in compensatory damages, representing "emotional pain and suffering," and $50,000.00 in punitive damages.  (*Compare* Dkt. No. 44, p. 9, *with* Dkt. No. 105 at 55.)

---

[5]     Counter Claimant initially identified the Chief of the Manlius Police Department as a second witness; however, the Chief did not appear at the hearing.  (Dkt. No. 99; Dkt. No. 105 at 4.)

[6]     The exhibits referenced in Dkt. No. 105 correspond only to those marked and admitted during the proceeding of that day, and not the pre-hearing exhibits submitted on October 13, 2022, via CM/ECF.  (*See generally* Dkt. No. 105; *cf.* Dkt. Nos. 98, Attach. 1 and 98, Attach. 2.)  The undersigned notes that Counter Claimant's CM/ECF submissions included two files of anticipated exhibits marked as "A" and "B," even though each file contained several individual documents.  (Dkt. Nos. 98, Attach. 1 and 98, Attach. 2.)  At the outset of the hearing, the undersigned accepted into evidence the electronically submitted exhibits, at Counter Claimant's counsel's request.  (Dkt. No. 105 at 4-5.)  However, during Counter Claimant's direct examination, counsel introduced six exhibits in total (i.e., "A" through "F"), some of which included documents from the pre-hearing exhibits.  (*See* Dkt. No. 105 at 21, 22, 25, 27, 28, 29; Dkt. Nos. 98, Attach. 1 and 98, Attach. 2.)  In the future, to avoid unnecessary confusion counsel is encouraged to attempt to use the same exhibit number/letter designations as best as possible, and, in any event, submit individual exhibits as separate files when uploading to CM/ECF.

As reflected by the hearing evidence, Counter Claimant has been a police officer for about five and one-half years with Manlius Police Department, which employs approximately 35 officers in total. (Dkt. No. 105 at 12.) Counter Claimant maintains a good reputation within the department, as reflected by his numerous awards and commendations, including the department's "Police Officer of the Year Award" in 2020, which Counter Claimant described as "one of my most proud awards." (Dkt. No. 105 at 12-13.)

At some point after the traffic stop on August 8, 2019, Counter Claimant learned from his supervisors that Counter Defendant had made several allegations about him. (Dkt. No. 105 at 22.) In pertinent part, Counter Defendant stated that Counter Claimant touched his "private area," "manhandled" him, threw him against the car, and targeted him based on his ethnicity. (Dkt. No. 105 at 24-34.) Following an investigation into the matter, the department deemed the allegations to be unsubstantiated and/or unfounded. Dkt. No. 105 at 40.) Counter Claimant explained that "it was very challenging during those times to have to show up to work every day knowing that this was hanging over my head." (Dkt. No. 105 at 36.) Counter Claimant does not recall the duration of the investigation or how long it took the department to reach its conclusion. (Dkt. No. 105 at 40.)

Counter Claimant testified that he did not suffer any monetary loss as a result of Counter Defendant's statements. (Dkt. No. 105 at 47.) For instance, Counter Claimant was not placed on administrative leave, he took no sick leave or time off from work, and he received no formal or informal sanction or discipline. (Dkt. No. 105 at 40-42.) Likewise, Counter Claimant's

assignments were not altered and he continued working on the road as a patrol officer.[7]  (Dkt. No. 105 at 42.)

Counter Claimant testified that he was unaware of any instances wherein he was treated negatively by fellow officers or department employees because of Counter Defendant's statements.  (Dkt. No. 105 at 44.)  Counter Claimant described trying to find "humor" over the incident during interactions with his colleagues and personnel in the department—a common outlet for law enforcement officers regularly exposed to trauma and crisis, according to Counter Claimant.  (Dkt. No. 105 at 38.)  Nonetheless, Counter Claimant expressed that having to hear comments at work related to Counter Defendant's statements "did take a toll" on Counter Claimant.  (Dkt. No. 105 at 39.)

Outside of the department, to Counter Claimant's knowledge, there has been no press or media articles covering the incident.  (Dkt. No. 105 at 44.)  However, Counter Claimant testified that he received concerned statements from unnamed "friends and family" who purportedly "googled" Counter Claimant's name, finding the publicly available filings of the instant case. (Dkt. No. 105 at 45.)  Counter Claimant expressed that he is troubled that Counter Defendant's statements are "highlighted on the internet" and "accessible to anyone with the click of a button." (Dkt. No. 105 at 45.)

Finally, Counter Claimant testified that he did not seek or receive professional counseling or other related resources in connection with the incident.  (Dkt. No. 105 at 42-43.)  Counter Claimant described having "a pretty good group of family members and friends that [he]

---

[7]   Counter Claimant described a subsequent interaction with Counter Defendant while patrolling the streets of Manlius, wherein Counter Defendant drove by shouting "curse words and inappropriate things" at Counter Claimant.  (Dkt. No. 105 at 46.)

consult[s] with to talk to regularly" and within that circle, the incident involving Counter Defendant "was a topic of discussion at the time, daily." (Dkt. No. 105 at 43.)

## II.   DISCUSSION

### A.   Evidentiary Principles

Pursuant to Federal Rule of Civil Procedure 55(b)(2), where a default judgment has been entered against a party, the court may conduct a hearing to determine the amount of recoverable damages. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992) ("While a party's default is deemed to constitute a concession of all well-pleaded allegations of liability, it is not considered an admission of damages."). The default judgment does not grant "a blank check to recover[.]" *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 159 (citation omitted). The party seeking an award must still prove damages with "reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999).

### B.   Damages

New York law permits recovery of compensatory damages in defamation cases for actual injuries sustained.[8] *See Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 335-344 (S.D.N.Y. 2016) (discussing, in detail, nature of compensatory damages and notable New York defamation awards). In awarding compensatory damages, the United States Supreme Court has provided the following guidance:

> Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory

---

[8]   "Under New York law, a defamation plaintiff must establish five elements: (1) a . . . defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (citations omitted). In addition, a public official, such as a police officer, must prove that the statement was made with "actual malice"— that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." *Palin*, 940 F.3d at 809 (citations and internal quotations omitted); *see also Brady v.*

> falsehood include impairment of reputation and standing in the
> community, personal humiliation, and mental anguish and suffering . . . .
> [A]ll awards must be supported by competent evidence concerning the
> injury, although there need be no evidence which assigns an actual dollar
> value to the injury.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974).

"In calculating non-economic damages in a defamation case, including humiliation, mental suffering and [reputational] damages," factors that may be considered include: "[1] the plaintiff's standing in the community, [2] the nature of [the] statements made . . . , [3] the extent to which the statements were circulated, [4] the tendency of the statement to injure a person . . ., and [5] all of the other facts and circumstances in the case." *Cantu v. Flanigan*, 705 F. Supp. 2d 220, 227-228 (E.D.N.Y. 2010) (citations omitted); *see also* N.Y. Pattern Jury Instr. Civil 3:29 (collecting cases). In any event, "[e]ven where the plaintiff can show no actual damages at all, a plaintiff who has otherwise shown defamation may recover at least nominal damages." *Van-Go Transport Co., Inc. v. N.Y.C. Bd. of Educ.*, 971 F. Supp. 90, 100 (E.D.N.Y. 1997); *see e.g., Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 179-180, 191 (2d Cir. 2000) (affirming, in part, $1.00 nominal damages award where the plaintiff failed to prove actual injury); *Capax Discovery, Inc. v. AEP RSD Investors, LLC*, 17-CV-0500, 2021 WL 3909857, at *12 (W.D.N.Y. Sept. 1, 2021) (awarding nominal damages in the amount of $100.00 each to the defendants' successful defamation counterclaims).

Moreover, "[u]nder New York law, punitive damages in a defamation case are justified 'to punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful

---

*Ottaway Newspapers, Inc.*, 84 A.D.2d 226, n.5 (N.Y. App. Div. 2d Dep't 1981) (collecting cases) ("The matter is well settled in this State, a police officer is a public official."). "Generally, spoken defamatory words are slander; written defamatory words are libel." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001). Considering that Counter Claimant's counterclaims involve both written and spoken words, the term "defamation" is used herein without distinction.

9

disregard for another's rights.'" *DiBella v. Hopkins*, 403 F.3d 102, 122 (2d Cir. 2005) (quoting *Prozeralik v. Cap. Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479-80 (N.Y. 1993)). "Satisfying the actual malice standard does not suffice." *Stern v. Cosby*, 645 F. Supp. 2d 258, 286 (S.D.N.Y. 2009) (citing *Dibella*, 403 F.3d at 122). Rather, "[t]o be entitled to punitive damages, a defamation plaintiff must prove that the defendant acted, toward the plaintiff, with 'hatred, ill will, spite, criminal mental state or that traditionally required variety of common-law malice.'" *Stern*, 645 F. Supp. 2d at 286 (quoting *Prozeralik*, 82 N.Y.2d at 479-80).

Furthermore, "due process requires that [punitive damages] be reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 344 (S.D.N.Y. 2016) (internal quotations and citations omitted). The Supreme Court has offered three "guideposts" in awarding punitive damages: "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between the remedy and the civil penalties authorized or imposed in comparable cases." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

**C.     Analysis**

After carefully considering the record evidence, and in light of the factors applicable to New York defamation awards, I find that Counter Claimant has not presented sufficient evidence entitling him to $10,000.00 in compensatory damages, or anything more than a nominal award.

As an initial matter, there is scant evidence that Counter Claimant's standing in the community was significantly diminished, if at all, because of Counter Defendant's defamatory statements. Counter Claimant was the sole witness at the inquest hearing and provided only speculative testimony about Counter Defendant's statements being unhelpful to his relations with

the community of Manlius.  (Dkt. No. 105 at 48-49.)  While the Court certainly agrees that Counter Defendant's statements could potentially damage Counter Claimant's standing in the community, there is nothing in the record indicating that the community at-large was even aware of the matter.

To be clear, Counter Claimant did provide testimonial evidence about his standing among colleagues and superiors within the Manlius Police Department.  On the whole, however, Counter Claimant's testimony undercuts his claim for damages because, if anything, the evidence shows that he maintains an exceptionally positive reputation within the department.  Perhaps most telling is that, while the incident at-hand occurred in August 2019, Counter Claimant was the recipient of the department's 2020 "Police Officer of the Year Award."  (Dkt. No. 105 at 12.)  Moreover, the department's internal investigation deemed Counter Defendant's allegations to be unfounded and there is simply no evidence that anyone within the department disagrees with that determination.  (Dkt. No. 105 at 39-40.)  According to Counter Claimant, his interactions with fellow officers regarding the incident have amounted to nothing more than good faith banter and/or the humor common among individuals dealing with daily law enforcement stresses.  (Dkt. No. 105 at 38-39.)

In analyzing the additional factors relevant to defamation awards, the Court acknowledges that the nature and substance of Counter Defendant's statements are troubling and undoubtedly have the potential to injure a police officer's reputation and wellbeing.  *See Cantu*, 705 F. Supp. 2d at 227-228 (citations omitted); *see also* N.Y. Pattern Jury Instr. Civil 3:29 (collecting cases).  However, the extent to which the statements were circulated appears limited

largely to those within Counter Claimant's own department.[9] (Dkt. No. 105 at 8-51.) The undersigned finds that this latter factor weighs heavily against an award of compensatory damages, particularly when viewed with all other facts and circumstances of the case previously discussed.

As noted above, Counter Claimant was cleared of wrongdoing in connection with Counter Defendant's unfounded allegations. (Dkt. No. 105 at 39-40.) Although Counter Claimant indicated that, during the investigation, "it was very challenging . . . to have to show up to work every day knowing that this was hanging over my head," there is no record evidence that the investigation itself was substantially prolonged in duration. (Dkt. No. 105 at 36.) There is also no evidence that Counter Claimant suffered any significant mental anguish during this period, or at any time thereafter. (*See* Dkt. No. 105 at 36-39.) Likewise, Counter Claimant suffered no actual damages that would warrant other monetary compensation, such loss of wages or days off. (Dkt. No. 105 at 40-42.) As such, although the undersigned found Counter Claimant's account about the stress caused by Counter Defendant's statements to be credible, without any medical corroboration or evidence of long-term distress, an award of compensatory damages would be inappropriate under the circumstances.

Finally, the undersigned must address Counter Claimant's request for $50,000.00 in punitive damages considering that there is mixed authority as to whether such an award is

---

[9] The only notable exception is that certain unnamed "friends and family" of Counter Claimant approached him about a Google search of his name, which apparently yielded filings from the instant case. (Dkt. No. 105 at 45.) Notwithstanding the privileges associated with publicly available court filings, the evidence suggests that these unnamed individuals were specifically seeking information about Counter Claimant, and that they belonged to the same "pretty good group of family members and friends" that Counter Claimant consults with on a regular basis. (Dkt. No. 105 at 43.) In any event, the filings of the instant case, including this report-recommendation, reflect that Counter Claimant has overwhelmingly cleared his name of Counter Defendant's allegations.

permissible in the absence of compensatory damages. *See Webber v. Dash*, 19-CV-0610, 2022 WL 2129025, at *9 (S.D.N.Y. Jun. 14, 2022) (collecting cases). As discussed above, punitive damages are intended to punish a person for outrageous conduct that is malicious, wanton, and reckless, and to deter its repetition. *DiBella*, 403 F.3d at 122 (citation omitted). I find that Counter Claimant failed to present evidence that Counter Defendant acted with the requisite malice to support a finding of punitive damages.

Moreover, the Court is particularly sensitive to the unique circumstances of this case—namely, that Counter Defendant was utilizing (albeit abusing) legitimate grievance mechanisms intended for good faith complaints about law enforcement officers. This presents a dilemma considering that, on one hand, a punitive damages award could plausibly deter future good faith complainants from coming forward on the perception that, if a complaint is deemed unfounded, an aggrieved officer may pursue a defamation claim in response. On the other hand, the fact that Counter Defendant has been found liable for effectively abusing such processes seems itself worthy of a punitive measure in order to prevent him—and others—from doing it in the future. The undersigned has considered this issue carefully and, out of an abundance of caution, based on the unique circumstances of this case it is recommended that no punitive damages be awarded.

Accordingly, it is recommended that Counter Claimant be entitled to nominal damages in the amount of $1.00.[10]

---

[10] The Court notes that the appropriate value of nominal damages is an unclear area of the law. "[T]here is some authority . . . for the proposition that damages exceeding $1 cannot be considered truly 'nominal.'" *Am. Infertility of New York, P.C. v. Deep Blue Health New Zealand Ltd.*, 17-CV-5666, 2019 WL 10786023, at *8 (S.D.N.Y. Dec. 30, 2019) (citing *Carey v. Piphus*, 435 U.S. 247, 267 (1978) (directing the district court on remand that the plaintiffs in an action pursuant to 42 U.S.C. § 1983 may be entitled to recover nominal damages "not to exceed one dollar"); *Birnbaum v. United States*, 588 F.2d 319, 333 (2d Cir. 1978) ("The question is whether

**ACCORDINGLY**, it is

**RECOMMENDED** that Counter Claimant Triston Campbell be awarded $1.00 in nominal damages[11]; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Report and Recommendation on the parties, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

---

the testimony of the plaintiffs sustains a finding of mental anguish under New York law, in which event the judgment for $1,000 each would not be excessive, or whether there was no actual damage, in which case only nominal damages of one dollar would have been proper."); *Magnett v. Pelletier*, 488 F.2d 33, 35 (1st Cir. 1973) (explaining that an award of $500 "cannot be properly regarded as nominal damages" and reducing an award of nominal damages to $1)). However, there are also several cases awarding nominal damages an amount above one dollar. *Cf. Capax Discovery, Inc. v. AEP RSD Investors, LLC*, 17-CV-0500, 2021 WL 3909857, at *12 (W.D.N.Y. Sept. 1, 2021) (awarding the defendants "nominal damages in the amount of $100.00 each" in a defamation case); *AOS Holding Co. v. Bradford White Corp.*, 18-412-LPS, 2021 WL 5411103, at *40 (D. Del. Mar. 31, 2021) (awarding $2.00 in nominal damages); *Synthes USA, LLC v. Syntec Sci. (USA) Corp.*, 09-CV-1875, 2012 WL 13014729, at *4 (C.D. Cal. Mar. 20, 2012) (awarding $100 in nominal damages on default); *Adair v. Advanced Metal Fabrication, Inc.*, 10-CV-1749, 2011 WL 13323633, at *2 (N.D. Ga. May 3, 2011) (awarding nominal damages in the amount of $800); C. McCormick, Law of Damages § 21, p. 87 (1935) (McCormick) ("generally accepted practice . . . would consider as 'nominal' only an amount such as a few cents or a few dollars, say not more than $10"); *but see Am. Fertility of New York, P.C.*, 2019 WL 10786023, at *7 (finding $10,000 to be a non-nominal amount). Several model jury instructions direct an award of nominal damages not to exceed one dollar. 3B Fed. Jury Prac. & Instr. § 168:61 (6th ed.) ("If you find in favor of plaintiff . . . , but you find plaintiff's damages have no monetary value, then you must return a verdict for plaintiff in the nominal amount of one dollar."); 3B Fed. Jury Prac. & Instr. § 168:221 (6th ed.) (same). Because juries are often limited to awarding nominal damages in the amount of $1.00, it seems appropriate for the Court to be similarly constrained. As a result, the Court recommends nominal damages in the amount of $1.00.

11       As referenced during the November 10, 2022, hearing, a bill of costs and disbursements, if any, must be submitted after the District Judge issues a final judgment, and must comply with the provisions set forth in Local Rule 54.1(a). (Dkt. No. 105 at 56.)

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[12]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: December 16 , 2022
       Binghamton, New York

*Miroslav Lovric*
Miroslav Lovric
U.S. Magistrate Judge

---

[12]   If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).